UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| National Truck Protection Co., Inc., | |
| *Plaintiff*, | |
| v. | No. 23 CV 16880 |
| Crown Point Truck & Trailer Repair Center, Inc., and Crown Point Truck & Trailer Sales, Inc. | Judge Lindsay C. Jenkins |
| *Defendants.* | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff National Truck Protection Co., Inc. ("NTP") brings this lawsuit against Defendants Crown Point Truck & Trailer Repair Center, Inc. and Crown Point Truck & Trailer Sales, Inc. for trademark infringement and dilution under the Lanham Act, deceptive trade practices under Illinois law, and common law fraud. Before the Court is NTP's motion for summary judgment. [Dkt. 36.] For the reasons below, the motion is granted in part and denied in part.

**I.   Background**

The following facts are taken from the parties' Local Rule 56.1 statements and supporting exhibits, [Dkts. 37-2, 38-1, 38-2]. The Court presents the facts in the light most favorable to the non-moving party. *Emad v. Dodge Cty.*, 71 F.4th 649, 650 (7th Cir. 2023). These facts are undisputed except where a dispute is noted.

Plaintiff National Truck Protection Co., Inc. ("NTP") is an independent provider of vehicle service contracts ("VSCs"), otherwise known as "extended warranties," to the North American trucking industry and owners of trucks used in

1

the truck market. [Dkt. 38-2, ¶ 2.] The VSCs sold by NTP allow truck owners to submit reimbursement claims for truck repairs or replacements done by a qualified repair facility once the customer obtains authorization from NTP. [*Id.* at ¶ 4.] As part of the claim process, the qualified repair facility is required to submit supporting documentation including a repair estimate and explanation of the repairs needed, along with photos of the allegedly damaged vehicle parts. [*Id.* at ¶ 5.]

Defendant Crown Point Truck & Trailer Repair Center, Inc. ("Crown Point") was authorized to repair vehicles under NTP contracts.[1] Between April 25, 2019 and August 11, 2020, Crown Point submitted, via telephone call and emails, 18 claims to NTP seeking payment for vehicle repairs they allegedly performed under VSCs issued to NTP customers. [*Id.* at ¶¶ 6–7.] As part of each claim, Crown Point submitted supporting documentation including a repair estimate and explanation of the repairs needed together with photographs of the allegedly damaged vehicle parts. NTP reviewed the 18 Crown Point claims and supporting documents and, based on those documents, reimbursed 16 of the 18 repair claims. [*Id.* at ¶¶ 8–11.] NTP later[2] discovered a red flag associated with a Crown Point claim, prompting further investigation by NTP Claim Process Manager, Andy Warnstaff. Using Google's reverse-image search function, he discovered that images used to support 12 of the

---

[1] Neither party specified when Crown Point was first authorized to repair vehicles under NTP contracts, but it is inferable that Crown Point was so authorized at least between April 25, 2019 and August 11, 2020, the period during which NTP admits Crown Point submitted the reimbursement claims at issue. [Dkt. 38-2, ¶ 6.]
[2] NTP claims that the flags were discovered and the license was revoked in August 2020, but the evidence cited provides no date and the Court could not find one. [Dkt. 38-2, ¶ 19; Dkt. 37-5 ("Bishop Decl.").]

claims[3] existed on other websites prior to Crown Point's claims being submitted.[4] [Dkt. 38-2, ¶¶ 15–16; Dkt. 37-7 at 45–55.]

NTP also owns and uses multiple trademarks for its names and products, including the registered trademark "NTP," U.S. Reg. 3512348, for use with VSCs on trucks, and the associated mark "National Truck Protection," U.S. Reg. 3556446, both of which NTP had consistently used since 1992. NTP or its predecessor also owned the mark "Premium 2000+," U.S. Reg. 5750440, and had consistently used it in connection with extended warranties on trucks since 1990. [Dkt. 38-2, ¶ 17.] NTP authorizes use of its trademarks to licensed vendors throughout the United States, including in Illinois. As part of the license agreement, vendors agree to terms and conditions associated with the use of the trademarks to preserve NTP's reputation vis a vis its customers and consumers.[5] [*Id.* at ¶ 18.]

On March 27, 2019, NTP entered into a Universal Extended Warranty Dealer Agreement with Defendant Crown Point Truck & Trailer Sales, Inc. ("Crown Sales"), which authorized Crown Sales to advertise and sell NTP VSCs. Crown Sales had the

---

[3] NTP didn't specify the number of claims for which allegedly false images were found, but the evidence cited compares images for 12 different claims. [Dkt. 37-7 at 45–55.]

[4] Defendants deny that the images Warnstaff found online match those submitted to NTP, but the evidence cited in support of this objection does not refute the factual statement. It merely cites to Crown Point President and CEO Ovidiu Astalus' affidavit stating that he was unaware of any false claims. Defendants' L.R. 56.1 Statement also denies that they submitted false claims but only cites generally to the same Astalus affidavit and Defendants' Answer. [Dkt. 38-1, ¶ 1.] A conclusory denial is insufficient to rebut NTP's evidence, which clearly shows that photos submitted in support of 12 claims are identical to photos from other sources on the internet preexisting and unrelated to those claims. [Dkt. 37-7 at 45–55.] Paragraphs 15–16 are admitted.

[5] Defendants object to the factual statement concerning vendor terms but the evidence cited in support of the objection does not controvert it. L.R. 56.1(e)(3). Paragraph 18 is admitted.

3

same principal place of business and owner as Crown Point. [*Id.* at ¶¶ 3, 19; Dkt. 37-6 at 1–7.] Upon discovering that images used to support claims submitted to NTP between April 25, 2019 and August 11, 2020 were copied from images that previously existed elsewhere on the internet, NTP revoked Defendants' license for use of its trademarks and instructed Defendants to cease using the marks. [*Id.* at ¶ 19; Dkt. 37-5 ("Bishop Decl."), ¶ 14.] Crown Sales and Crown Point continued to display NTP's trademarks on their websites after NTP revoked the license until at least November 15, 2023. [Dkt. 38-2 at ¶¶ 20–22; Bishop Decl. at ¶¶ 11, 16.]

NTP subsequently filed this lawsuit against Crown Point and Crown Sales seeking compensatory and injunctive relief for trademark infringement and dilution under the Lanham Act, 15 U.S.C. §§ 1114, 1125(c), deceptive trade practices under the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/1 *et seq.*, and common law fraud. NTP has moved for summary judgment on all claims.

## II. Legal Standard

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Birch|Rea Partners, Inc. v. Regent Bank*, 27 F.4th 1245, 1249 (7th Cir. 2022). The Court "must construe all facts and

draw all reasonable inferences in the light most favorable to the nonmoving party." *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 532 (7th Cir. 2013) (citation omitted).

### III. Analysis

#### A. Fraud

In Count III, NTP claims that Crown Point intentionally submitted fraudulent photos of failed vehicle components in support of Crown Point's reimbursement claims.[6] Specifically, NTP claims that Crown Point copied photos of vehicle components taken from the internet that were not associated with any vehicle that would be repaired under an NTP contract to induce NTP to reimburse the claims. A common law fraud claim in Illinois has five elements: "(1) a false statement of material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent that the statement induce the plaintiff to act; (4) plaintiff's reliance upon the truth of the statement; and (5) plaintiff's damages resulting from reliance on the statement." *Squires-Cannon v. Forest Pres. Dist. of Cook Cnty.*, 897 F.3d 797, 805 (7th Cir. 2018) (quoting *Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 591 (Ill. 1996)); *Ash v. PSP Distrib., LLC*, 226 N.E.3d 748, 753–54 (Ill. App. Ct. 2023). A plaintiff must prove a fraud claim by clear and convincing evidence and the Court is to evaluate the evidence presented on summary judgment "through the prism of the substantive evidentiary burden." *Richelieu Foods, Inc. v. New Horizon Warehouse Distrib. Ctr., Inc.*, 67 F. Supp. 3d 903, 915 (N.D. Ill. 2014) (quoting *Liberty Lobby*, 477 U.S. at 254).

---

[6] NTP alleged in its complaint that Crown Point also submitted false vehicle repair estimates, but did not argue this point in its summary judgment briefing and the allegation in its L.R. 56.1 Statement is unsupported by the evidence cited. [Dkt. 38-2, ¶ 14.]

Crown Point does not properly dispute that fraudulent photos were attached to at least 12 reimbursement claims submitted to NTP, *supra* Part I n.4, that it intended and that NTP in fact relied on these photos to assess and approve the claims, or that NTP was damaged due to its reliance on the photos. The parties only dispute whether Crown Point knew that any claims it submitted to NTP included false statements. [Dkt. 38 at 4–5.]

Fraud is difficult for a plaintiff to prevail on at summary judgment because intent is a subjective element better left to a jury. *Fed. Deposit Ins. Corp. v. Lauterbach*, 626 F.2d 1327, 1335 n.12 (7th Cir. 1980); *Cement-Lock v. Gas Tech. Inst.*, 523 F. Supp. 2d 827, 857–58 (N.D. Ill. 2007). The plaintiff also bears the ultimate burden of showing fraud by clear and convincing evidence. At summary judgment then, a moving plaintiff must "lay out the elements of the claim, cite the facts which it believes satisfies these elements, and demonstrate why the record is so one-sided as to rule out the prospect of finding in favor of the non-movant on the claim." *Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 601 (7th Cir. 2015).

NTP has not met its burden. Its attempted demonstration of intent is, at best, conclusory and it fails to draw all reasonable inferences in a light most favorable to Defendants. NTP argues that Crown Point's fraudulent intent is clear because Ovidiu Astalus, Crown Point's President and CEO, "incredulously" claimed in his deposition that he had "no idea who allegedly took the photographs or how they wound up attached to the claims [emails]," yet is the only person whose name is "attached to each and every claim submitted to NTP." [Dkt. 37 at 10.] But NTP has not shown

6

that Astalus' name is on any email or claim containing the allegedly fraudulent photos—NTP didn't cite evidence for this proposition and the only emails the Court is aware of were sent from a general Crown Point Service Department email account[7]; they do not contain Astalus' name. [*See* Dkt. 37-7 at 46–55.] The Court has no duty to hunt for such facts, particularly when NTP is "best positioned and best motivated to provide more information in support of his claim." *Lane v. Structural Iron Workers Local No. 1 Pension Trust Fund*, 74 F.4th 445, 452–53 (7th Cir. 2023); *United States v. 5443 Suffield Terrace, Skokie, Ill.*, 607 F.3d 504, 510 (7th Cir. 2010) (at summary judgment, "it was not the district court's job to sift through the record and make [plaintiff's] case for him.")]

Additionally, Astalus' testimony explains that he didn't know who took the pictures attached to the claims because either he or a technician would have taken them, depending on who was in the office at the time. [Dkt. 37-1 ("Astalus Dep.") at 20:5–24:2.] A reasonable jury might conclude from this information that, even if Astalus submitted or approved the claims, he did not know the pictures were lifted from the internet and therefore didn't intend to defraud NTP. Alternatively, a factfinder might infer intent from the circumstantial evidence. After all, Crown Point submitted as many as 12 reimbursement claims with images that are strikingly similar to images that previously existed on the internet. Who to believe is for the jury to decide. But at this stage, a genuine dispute exists as to whether NTP has shown by clear and convincing evidence that Crown Point acted intentionally. *See,*

---

[7] service@crownpointcorp.com

*e.g.*, *Barnes v. Duffy*, 2004 WL 2931326, at *5–6 (N.D. Ill. Dec. 15, 2004) (holding that plaintiff was not entitled to summary judgment on fraud claim due to conclusory argument on intent element). Summary judgment is denied on Count III.

### B. Trademark Infringement

Next, NTP argues that Defendants infringed on its trademarks by continuing to display them on their websites after NTP revoked their right to do so. 15 U.S.C. § 1114. "[T]o succeed on a trademark infringement claim, the claimant must show that it owns a valid, protectable trademark and that there is a likelihood of confusion caused by the alleged infringer's use of the disputed mark." *Grubhub Inc. v. Relish Labs LLC*, 80 F.4th 835, 844 (7th Cir. 2023), *cert. denied*, 144 S. Ct. 2630 (2024). The claimant must also show that the defendant's use of the trademark in commerce was unauthorized. *Segal v. Geisha NYC LLC*, 517 F.3d 501, 506 (7th Cir. 2008) ("[T]here can be no likelihood of confusion and no violation of the Lanham Act if the alleged infringer uses the mark as authorized.").

There is no genuine dispute that Defendants continued to use the same protected NTP trademarks after NTP terminated their license, on the same websites, and in the same manner. The parties only contest whether Defendants' continued use of the trademarks after NTP revoked its permission was likely to cause confusion.

In the Seventh Circuit, seven factors generally determine the likelihood of confusion: "(1) the similarity between the marks in appearance and suggestion; (2) the similarity of the products; (3) the area and manner of concurrent use; (4) the degree of care likely to be exercised by consumers; (5) the strength of the plaintiff's

8

mark; (6) any evidence of actual confusion; and (7) the intent of the defendant to 'palm off' his product as that of another." *Sorensen v. WD-40 Co.*, 792 F.3d 712, 726 (7th Cir. 2015). Along this line of analysis, Defendants argue that NTP failed to offer any evidence that their continued use of the trademarks actually confused consumers. [Dkt. 38 at 4.] They also deny that they intended to use NTP's trademarks to solicit customers after the revocation of the license—they simply had "not updated" their websites.[8] [*Id.* at 2–3.]

But the seven factors are irrelevant for infringement involving a licensor and ex-licensee. Rather, it is well-established that "the use of a trademark after a license agreement's termination *by itself* establishes a likelihood of confusion." *Chicago Mercantile Exch. Inc. v. ICE Clear US, Inc.*, 2020 WL 1905760, at *18 (N.D. Ill. Apr. 17, 2020) (emphasis added) (collecting cases). As courts have explained, consumers associate a licensee with the licensed trademarks it displays. When a licensee continues to use those same trademarks after its relationship with the licensor ends, consumers will nevertheless continue to associate the ex-licensee with the licensor. Not even a sophisticated consumer could detect a change in relationship because the ex-licensee continues to use the licensor's exact trademarks. The likelihood of

---

[8] Although unclear from the briefing, if Defendants mean to suggest they were not using the marks "in commerce" because they didn't intend to solicit customers, that argument fails. Under the Lanham Act, a mark is "use[d] in commerce" on services "when it is used or displayed in the sale or advertising of services and the services are rendered in commerce." 15 U.S.C. § 1127. Defendants displayed the marks on their websites in connection with their services (vehicle repair). Crown Point and Crown Sales President and CEO Ovidiu Astalus also stated that Defendants used the marks "with the intent to properly submit documentation and provide the service to customers." [Dkt. 38-3 ("Astalus Aff."), ¶ 5.] There is no genuine dispute that Defendants used NTP's marks "in commerce."

9

confusion is therefore so great that it can be presumed. *Id.*; *7-Eleven, Inc. v. Spear*, 2012 WL 13390021, at *5–6 (N.D. Ill. May 11, 2012); *All Star Championship Racing, Inc. v. O'Reilly Auto. Stores, Inc.*, 940 F. Supp. 2d 850, 860–61 (C.D. Ill. 2013). Such infringement cases are considered "open and shut." *7-Eleven, Inc.*, 2012 WL 13390021, at *6 (quoting 3 J. McCarthy, *Trademarks and Unfair Competition* § 23.3); *see also In re XMH Corp.*, 647 F.3d 690, 695 (7th Cir. 2011) ("If the owner of the trademark has broken off business relations with a licensee he cannot ensure the continued quality of the (ex-)licensee's operation, whose continued use of the trademark is therefore a violation of trademark law.") (quoting *Gorenstein Enters., Inc. v. Quality Care-USA*, Inc., 874 F.2d 431, 435 (7th Cir. 1989)).

NTP is entitled to summary judgment on Count I to the extent that it seeks damages. *See* 15 U.S.C. §§ 1114(b), 1117. However, NTP's prayer for injunctive relief appears moot based on its acknowledgement that Crown Point and Crown Sales have ceased using its trademarks. [Dkt. 37 at 5 ("Defendants only removed the Marks after the filing of this Complaint.")]

### C. Trademark Dilution

In Count II, NTP alleges that Defendants diluted its trademarks by continuing to use them after NTP revoked their license. 15 U.S.C. § 1125(c). The purpose of a dilution claim is to protect "the trademark owner from the erosion of the distinctiveness and prestige of a trademark caused by . . . a proliferation of borrowings, that . . . are so numerous as to deprive the mark of its distinctiveness and hence impact." *Eli Lilly & Co. v. Nat. Answers, Inc.*, 233 F.3d 456, 466 (7th Cir. 2000)

10

(quoting *Illinois High School Ass'n v. GTE Vantage Inc.*, 99 F.3d 244, 247 (7th Cir. 1996)). To prove trademark dilution, a plaintiff must show that (1) the mark is famous; (2) defendant adopted the mark after it became famous; (3) the infringer diluted the mark; and (4) defendant's use of the mark is commercial and in commerce. *AM Gen. Corp. v. DaimlerChrysler Corp.*, 311 F.3d 796, 811–12 (7th Cir. 2002).

NTP's motion fails on the first factor. A mark is "famous if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner." 15 U.S.C. § 1125(c)(2)(A). Relevant factors to consider in determining whether a mark is famous include, but are not limited to: (1) "[t]he duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties"; (2) "[t]he amount, volume, and geographic extent of sales of goods or services offered under the mark"; (3) "[t]he extent of actual recognition of the mark"; and (4) "[w]hether the mark was registered . . . on the principal register." § 1125(c)(2)(A). "[I]t is not easy for a mark to qualify for dilution protection," as the Lanham Act's dilution provision is "to be applied selectively and . . . only to those marks which are both distinctive and famous." *Manley v. Boat/U.S., Inc.*, 75 F. Supp. 3d 848, 858 (N.D. Ill. 2014) (quoting *Top Tobacco, L.P. v. N. Atl. Operating Co.*, 2007 WL 118527, at *8 (N.D. Ill. Jan. 4, 2007)).

NTP argues that its marks are famous because they have been registered and used by NTP or its predecessor for over 30 years. NTP also authorizes vendors across the United States to use its trademarks. It also claims it has "spent considerable time

11

and resources" to establish good will towards the trademarks and a reputation for the goods and services associated with them. [Dkt. 37 at 6; Dkt. 40 at 3–4; Dkt. 38-2, ¶¶ 17–18.] Finally, NTP states that it is a "nationally recognized company" and its marks are "well known in the industry." [Dkt. 37 at 7.]

Defendants argue that NTP has not provided enough evidence to establish that its marks are famous—while NTP claims by affidavit that its marks are nationally recognized, it has not shown evidence of actual notoriety. [Dkt. 38 at 3.] The Court agrees. NTP's statements of fact are based solely on the affidavit of NTP's General Counsel, which does not rely upon any external evidence for its factual assertions, except to show that NTP's marks are registered and can be licensed to vendors. NTP's claim that it has spent significant resources in establishing its trademarks and that they are in fact famous among the general public in the United States are wholly unsupported. *See Bobak Sausage Co. v. A & J Seven Bridges, Inc.*, 805 F. Supp. 2d 503, 523 (N.D. Ill. 2011) (denying plaintiff summary judgment and granting defendant's cross motion for summary judgment on dilution claim where plaintiff's only evidence of trademark fame was plaintiff company's president's deposition and affidavit asserting fame and discussing plaintiff's advertising expenditures and activities); *Plumeus, Inc. v. Intersog LLC*, 2013 WL 5609331, at *2 (N.D. Ill. Oct. 11, 2013) (dismissing dilution claim where plaintiff's only allegations as to the fame of its marks were that the marks were registered, that it invested substantial resources in marketing campaigns using the marks since 1996, and that the marks became famous through longstanding use nationally and internationally). NTP didn't address

12

Defendants' argument in its reply except to repeat conclusory claims of trademark fame and cite cases in which the fame of the marks was either undisputed or was assessed based on a prior version of the dilution provision. [Dkt. 40 at 3 (citing *Planet Hollywood (Region IV), Inc. v. Hollywood Casino Corp.*, 80 F. Supp. 2d 815 (N.D. Ill. 1999); *Syndicate Sales, Inc. v. Hampshire Paper Corp.*, 192 F.3d 633 (7th Cir. 1999)); *see Manley*, 75 F. Supp. 3d at 858 (explaining that the dilution provision § 1125(c) was amended in 2006 to use "the general public" as the benchmark market for assessing fame rather than "niche fame.")] NTP has not shown that its marks are famous within the meaning of the statute.

Separately, NTP made no argument at all with respect to the likelihood of or actual dilution of the value of its marks. Consequently, NTP has not shown that there is no genuine issue of material fact and summary judgment is denied on Count II.[9] *See Hotel 71 Mess Lender LLC*, 778 F.3d at 601.

### D. Illinois Uniform Deceptive Trade Practices Act

Last, NTP brings a claim under the Illinois Uniform Deceptive Trade Practices Act ("IUDTPA") based on Defendants' continued display of its trademarks on their websites after NTP revoked its authorization to use the marks (Count IV). The IUDTPA only provides injunctive relief and, to obtain such relief, a plaintiff must show a likelihood of future injury. *Kahn v. Walmart Inc.*, 107 F.4th 585, 606 (7th Cir. 2024) (citing 815 ILCS 501/3). Defendants correctly note, however, that NTP has

---

[9] As with Counts I and IV, Count II is moot to the extent that it seeks injunctive relief, though a plaintiff may seek damages for trademark dilution. *See* 15 U.S.C. §§ 1125(c)(5), 1117(a).

13

acknowledged that Crown Point and Crown Sales have ceased using its trademarks. [Dkt. 37 at 5 ("Defendants only removed the Marks after the filing of this Complaint.").] NTP did not respond to this point in its reply. [Dkt. 40 at 6.] Consequently, NTP has not shown any risk of continued harm warranting an injunction. Relief for the harm alleged is more appropriately sought through NTP's claims under the Lanham Act, which provides for damages. *See Neuros Co. v. KTurbo, Inc.*, 698 F.3d 514, 523 (7th Cir. 2012) (The IUDTPA is "generally thought indistinguishable from the Lanham Act except [ ] in its geographical scope."). Summary judgment is denied on Count IV and this claim will be dismissed.

### E.  Attorney's Fees

The Court considers NTP's request for attorney's fees under the Lanham Act in connection with Count I, the only claim on which it is entitled to summary judgment. Under the Lanham Act, "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a). A case may be "exceptional" if the totality of the circumstances suggests, and the court in its equitable discretion concludes, that it "stands out from others with respect to [1] the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or [2] the unreasonable manner in which the case was litigated." *LHO Chicago River, L.L.C. v. Rosemoor Suites, LLC*, 988 F.3d 962, 967 (7th Cir. 2021) (quoting *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014)). Relevant, though non-exclusive, factors a court may consider include "frivolousness, motivation, objective unreasonableness (both in the factual and legal

components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." *Id.* at 965 (quoting *LHO Chicago River, L.L.C. v. Perillo*, 942 F.3d 384, 386 (7th Cir. 2019)). The party requesting fees bears the burden of proving by a preponderance of the evidence that the case is "exceptional" sufficient to warrant an award of attorney's fees. *Octane Fitness*, 572 U.S. at 557–58; *Jergenson v. Inhale Int'l Ltd.*, 2023 WL 8935005, at *1 (N.D. Ill. Dec. 27, 2023), aff'd, 2024 WL 4430531 (7th Cir. Oct. 7, 2024).

NTP argues that this case is "exceptional" based on (1) "the egregious nature of [Defendants'] continued use of the Marks after being found to have committed fraud by NTP," and (2) Defendants knowingly continued to use the marks "for a substantial period of time—even after the filing of this case" after NTP cancelled their license. [Dkt. 37 at 11–12.] These reasons are unpersuasive because they boil down to an allegation of intentional or willful misconduct, which NTP has not shown; NTP did not prove fraud due to lack of evidence on the intent element, *supra* Part III.A, and NTP only claims in a conclusory fashion that Defendants willfully continued to display NTP's marks on their websites for a long time, while Defendants claim they simply hadn't updated the websites quickly enough. [Dkt. 38 at 7; *supra*, Part III.B.] Given that NTP did not cite any evidence to show when it revoked its license and instructed Defendants to remove the marks, the Court cannot conclude that Defendants willfully displayed the marks over an extended period. *See supra*, Part I n.2. NTP also admitted that Defendants removed the marks after this case was filed. [Dkt. 38 at 5.] NTP presented no other argument or evidence showing how this case

15

is "exceptional" within the meaning of section 1117(a). Therefore, it has not shown that it is entitled to attorney's fees on Count I.

## IV. Conclusion

For the reasons above, NTP's motion for summary judgment [Dkt. 36] is granted as to Count I for Trademark Infringement to the extent that it seeks damages; its prayer for injunctive relief is moot. NTP's motion for attorney's fees on Count I is also denied. The motion is denied as to Counts II, III and IV. Count IV, brought under the Illinois Uniform Deceptive Trade Practices Act is dismissed because there is no genuine dispute that Defendants have ceased using NTP's trademarks such that there is no basis for injunctive relief. The claims that remain to be tried are the trademark dilution and fraud claims, Counts II and III, respectively.

Enter: 23-cv-16880
Date: May 8, 2025

_____
Lindsay C. Jenkins

16